UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | | |
|---|---|---|
| LINDA WASHINGTON, | ) | Civil Action No.: 4:07-3552-TLW-TER |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| -vs- | ) | |
| | ) | **REPORT AND** |
| | ) | **RECOMMENDATION** |
| PERDUE FARMS, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

## I.    INTRODUCTION

This is an employment discrimination case.  Plaintiff alleges a cause of action for wrongful termination in violation of the Family Medical Leave Act, 29 U.S.C. § 2601, et seq, and for wrongful termination in violation of public policy.  Presently before the Court is Defendant's Motion for Summary Judgment (Document # 16).  The Plaintiff filed a Response in opposition to the Motion for Summary Judgment (Document # 21), and the Defendant filed a Reply (Document # 23).  All pretrial proceedings in this case were referred to the undersigned pursuant to the provisions of 28 U.S.C. § 636(b)(1)(A) and (B) and Local Rule 73.02(B)(2)(g), DSC.  Because this is a dispositive motion, this report and recommendation is entered for review by the district judge.

## II.    FACTUAL HISTORY IN THE LIGHT MOST FAVORABLE TO PLAINTIFF

On January 24, 2000, Perdue Farms, Inc. ("Defendant") hired Linda Washington ("Plaintiff") as a sanitation associate at its Dillon, S.C. plant. (Dep. Washington 5:7-17; 6:11-14.)[1]  A sanitation associate cleans machines used to process slaughtered chickens.  (Dep. Washington 5:15-17.)

---

[1] A copy of the Plaintiff's deposition is attached to the Defendant's Motion for Summary Judgment.

Plaintiff was never promoted.  (Dep. Washington 9:11-12.)  Plaintiff worked about eight (8) hours per day for five (5) or (6) days every workweek depending on her work schedule, and her wages were $8.85 per hour at the time she was terminated.  (Dep. Washington 9:13-21.)  Her supervisors were Tom Norris, Bobby Patterson, and her brother, John Caulder.  (Dep. Washington 10:2-12.)  During her employment, the Plaintiff suffered three on-the-job injuries: to her finger in March of 2002, to her knee during a slip-and-fall, and to her eyes on October 27, 2004.  (Dep. Washington 11:12-23; 12:11-20; 13:5-16.)

On Wednesday, October 27, 2004, Plaintiff sustained injury to her eyes while mopping overhead.  (Dep. Washington 14:14-23; 15:15-22; Exhibit 1.)[2]  She reported her injury to her supervisor, Tom Norris, who permitted Plaintiff to stop work and consult the nurse station inside the plant.  (Dep. Washington 15:19 - 16:20; Exhibit 2.)  Upon arriving at the nurse station, Plaintiff spoke with a nurse employed by Defendant, Tonya Davis, who "flushed" Plaintiff's eyes with "eye wash."  (Dep. Washington 17:9 - 18:6.)  The work injury occurred at about 9:45 p.m., and Plaintiff's shift ended at 11:00 p.m.  (Dep. Washington 18:7-13; Exhibit 1.)

On Thursday, October 28, 2004, Plaintiff returned to work.  Before clocking in for work, she presented to the nurse station at approximately 2:00 p.m. to report that her eyes still bothered her and hurt.  (Dep. Washington 26:12-23; Exhibit 2.)  The nurse put more "eyewash" in her eyes.  Id.  Plaintiff then clocked in at her scheduled time of 3:30 p.m.  (Dep. Washington 22:1-13.)  However, she did not go to the floor to do sanitation work.  Instead, she was paid for sitting in the nurse station all day doing "nothing" until she clocked out at 10:00 p.m.  (Dep. Washington 27:2-20.)  Plaintiff

---

[2] Exhibits 1 through 17 referred to in this report are attached to the Defendant's Motion for Summary Judgment.  The Plaintiff did not attach any exhibits to her Response brief.

2

recalled that she asked Mary [Sutherland] to go home on October 28 but "they just had me sitting in there." (Dep. Washington 27:9-24.) On Friday, October 29, 2004, Plaintiff returned to work. (Dep. Washington 30:22.) The nurses had scheduled the Plaintiff a consultation with an internist, Dr. Clifford Medina. (Dep. Washington 33:14-23; Exhibit 3.) Dr. Medina prescribed Plaintiff eye drops and ibuprofen. (Dep. Washington 34:13-16; Exhibit 3.) Additionally, Dr. Medina limited Plaintiff to "[n]o standing or walking, just a sitting job," from October 29, 2004 through October 30, 2004. (Dep. Washington 34:17-35:2; Exhibit 3.) Plaintiff signed a Modified Duty Agreement and Defendant assigned Plaintiff a sitting job, filing some papers at the nurse's station, pursuant to Dr. Medina's orders. (Dep. Washington 35:11-23. Exhibit 4.) On Saturday, October 30, 2004, Defendant assigned Plaintiff a sitting job in the cafeteria cleaning off the table or just sitting there, pursuant to Dr. Medina's orders and Plaintiff worked a usual shift. (Dep. Washington 36:16- 37:18.)

On Monday, November 1, 2004, Plaintiff consulted Dr. Medina again and worked a part shift. (Dep. Washington 40:18- 42:12.) Dr. Medina referred her to a Dillon optometrist, Dr. McKethan R. Gaddy, that same day who prescribed her more eye drops. (Dep. Washington 43:22- 44:17; Exhibit 6.) On November 2, 2004, Plaintiff returned to Dr. Gaddy's office who scheduled her for an appointment with an ophthalmologist in Florence, Dr. Mark Goulas, at 1:00 p.m. that same day. (Dep. Washington 45:1-6; 49:2-16.) Dr. Goulas dilated Plaintiff's eyes and prescribed her some additional eye drops. (Dep. Washington 50:25 – 51:15; Exhibit 8.) Dr. Goulas wrote a note for the Plaintiff to be excused from work on November 2, 2004, and that she should not have to return until Monday, November 8, 2004. (Exhibit 8; Dep. Washington 51:19 - 52:9.) Plaintiff returned to work on November 2, 2004, to show the nurses her doctor's note. While the Plaintiff stood beside Mary Sutherland, nurse Sutherland telephoned Dr. Goulas' office to ask if, and received

3

permission to, change the work restriction so that the Plaintiff could work provided the nurse just had her sit and provided Plaintiff would not be exposed to chemicals. (Exhibit 8; Dep. Washington 52:10 - 54:5.)

Sutherland testified that she worked as the Wellness Center Manager at the Defendant's plant in Dillon, South Carolina from mid-September 1999 until November 2006. (Aff. Sutherland ¶ 2.)[3] Sutherland did remember Linda Washington but Sutherland did not specifically recall Plaintiff's November 2, 2004, work excuse note from Dr. Goulas. (Aff. Sutherland ¶ 3.) Sutherland recalled that when she was presented with a medical excuse her practice was to telephone the health care provider to ask whether the employee could perform restricted work and if so the nature of the restrictions because plant workers could rarely afford seven consecutive days of unpaid leave and often want and need accommodating work while they overcome their health condition. (Aff. Sutherland ¶¶ 4-5.) Sutherland recalled that she would call the provider "while the employee is standing near me in the same room and can hear me ask the health care provider for the information the employee has given me permission to ask for." (Aff. Sutherland ¶ 6.) Sutherland explained that if she could find accommodating work within the plant she offered that work to the employee and that she has never forced or coerced an employee to take light duty or accommodating work. (Aff. Sutherland ¶¶ 7-9.)

Plaintiff recalled that she did stay at home on November 3, but that she came to work on November 4 and 5 and did not clock in but just sat in the nurse's station for a full shift on both days. (Dep. Washington 58:1- 59:18.) Sutherland had told the Plaintiff not to clock in, that they would handle everything else, just to come and sit in the nurse's station. (Dep. Washington 56:1 - 60:12.)

_____

[3] The Affidavit is attached to Document # 23.

4

Sutherland recalled that she advised Plaintiff "not to clock in because the time clock is located in an area of the plant where she might be further exposed to chemicals which would violate Dr. Goulas' work restrictions." (Aff. Sutherland ¶ 10). Sutherland advised Plaintiff's brother (who was the Plaintiff's supervisor) to make sure that the Plaintiff was paid for the days she worked restricted duty.[4] Id. Plaintiff's time sheet shows she did not work from November 3, 2004, through November 7, 2004. (Exhibit 13.)

Defendant's employees "clock in" and "clock out" using a time card with the employee's picture on it and a magnetic strip on the back similar in form and size to an ATM card; the time card was known as a "kronos card." (Dep. Washington 18:20 -19:16.) Plaintiff understood her time card was assigned to her and she was responsible for keeping it at all times. (Dep. Washington 19:17-20; 47:11-13.) Plaintiff kept a key to a lock used to secure a dressing locker inside Defendant's plant. (Dep. Washington 20:4-20.) Plaintiff kept her time card locked in her locker. (Dep. Washington 47:15-21.) On Tuesday, November 2, 2004, Plaintiff's time sheet shows her time card was clocked in at 9:00 a.m. and clocked out at 4:00 p.m. (Dep. Washington 45:18-25; Exhibit 13.) However, she does not think she worked during those times because her shift usually started at 3:30 p.m. (Dep. Washington 46:1-6.) She had "no idea whatsoever[,]" as to why her time card was clocked in at 9:00 a.m. (Dep. Washington 47:8-10.) Dr. Goulas' records include computer-printed diagnostic results showing a time of 2:59 p.m. on November 2, 2004, which is a time Plaintiff was still clocked in at work in Dillon. (Exhibit 8; Exhibit 13.) Plaintiff could not explain how she was simultaneously

---

[4] Whether or not the Plaintiff was actually paid for spending several days doing accommodating work for which she did not "clock in" is not in the record.

5

working in Dillon and visiting an ophthalmologist in Florence.  She agreed it is a "mystery."  (Dep. Washington 50:19-24.)

On Monday, November 8, 2004, Plaintiff returned to work and worked a full shift.  (Dep. Washington 61:20 – 62:5.)  On Tuesday, November 9, 2004, Plaintiff's time sheet shows her clocked in at 8:00 a.m. (Exhibit 13.)  However, she does not recall ever coming to work that early or working that day.  (Dep. Washington 62:22-63:16.)  On November 9, 2004, Plaintiff returned to Dr. Goulas' office in Florence during which he documented "pain is > than findings." (Exhibit 10.)  Dr. Goulas recommended that Plaintiff remain out of work for November 9, 2004, and November 10, 2004, and Plaintiff did not work on either of those days pursuant to Dr. Goulas' recommendation.  (Dep. Washington 65:17-19; Exhibit 13.)  On Thursday, November 11, 2004, and Friday, November 12, 2004, she worked full shifts.  (Dep. Washington 65:20 – 66:2; Exhibit 13.)  On Monday, November 15, 2004, through Wednesday, November 17, 2004, she worked full shifts.  (Dep. Washington 68:1-19; Exhibit 13.)  On Thursday, November 18, 2004, Plaintiff's time sheet shows her card clocked in at 3:30 p.m. and clocked out at 4:00 p.m.  (Dep. Washington 68:20 – 23; Exhibit 13.)  That same day, Plaintiff visited Dr. Goulas in Florence.  (Dep. Washington 69:10-12; Exhibit 11.)  Plaintiff admits she was visiting Dr. Goulas at the same time her time sheet shows her as clocked in at work. (Dep. Washington 78:8-15.) Dr. Goulas documented that Plaintiff's "eyes appear much better," and that he believed Plaintiff's eyes were "back to baseline." (Exhibit 11.) Dr. Goulas recommended that she return to work on Monday, November 22, 2004, and she did.  (Dep. Washington 69:20 – 72:9; Exhibit 11; Exhibit 13.)

On Sunday, November 21, 2004, an employee of Defendant, Beth Tyndall, prepared an email to nurse Mary Sutherland to determine if Sutherland had clocked the Plaintiff in and out during

certain days in November 2004. (Exhibit 14.) Tyndall explained that one of Plaintiff's supervisors, Bobby Patterson, was concerned that another employee was using Plaintiff's time card to clock Plaintiff in and out. (Exhibit 14.) Defendant's policy concerning time cards was contained in the handbook issued to each employee and stated, "[t]ampering with time cards or time clocks, punching in or out for another associate, allowing someone else to punch in or out for you, or in any way falsifying time records are grounds for termination." (Exhibit 15.) On Monday, November 22, 2004, when Plaintiff returned to work, Bobby Patterson, requested that Plaintiff come into his office to discuss his findings that Plaintiff's time card had been clocked in on November 18, 2004, during times he knew Plaintiff was absent. (Dep. Washington 73:3 – 24; Exhibit 16.) Defendant placed Plaintiff on suspension for three (3) days pending termination. (Dep. Washington 73:25-74:3; Exhibit 16.) November 25, 2004, was Thanksgiving day. On November 29, 2004, Defendant terminated Plaintiff's employment for violation of Defendant's time card policy.[5] (Exhibit 17.)

Plaintiff did not recall submitting any paperwork to request FMLA leave related to her eye injury. (Dep. Washington 40:7-17.) In fact, Plaintiff testified that she did not know that FMLA leave was available after her eye injury. (Dep. Washington 91:15-25, 99:3 - 100:2.) Plaintiff did not ask anyone employed with Defendant about how to take FMLA leave for her eye injury. Id. Plaintiff admitted that she had taken FMLA leave several times prior to her eye injury.[6] (Dep.

---

[5] Plaintiff acknowledged that on October 12, 2004, she and a co-worker had an issue about cigarettes and that on July 27, 2004, the Plaintiff was noted for poor work performance. (Dep. Washington 86:11 - 87:24.)

[6] In May 2001, the Plaintiff took approximately fifteen days of FMLA leave for "back pain." In September 2001, she took approximately thirteen days FMLA leave for "arthritis." In June 2002, she took approximately eight days FMLA leave for "pylonephritis." In July 2003, she took approximately four to eight weeks of FMLA leave to recover from knee surgery. She took FMLA leave for approximately seven days in April 2004 for "multiple contusions to face & neck." In

Washington 92:12 - 99:2.)  Plaintiff acknowledged that Defendant made the appointments for the Plaintiff to see the several doctors in November 2004 and that the Defendant did not interfere with her going to those doctors' appointments.  (Dep. Washington 81:4 – 82:7; 90:6 – 91:6.)

Plaintiff filed her Complaint on September 27, 2007, in the Florence County Court of Common Pleas.  The Defendant removed the action to this court on October 26, 2007.  She testified that she filed this lawsuit against the Defendant because "management sucks" and she feels that she was not "treated right."  (Dep. Washington 88 – 89.)  She further stated that she believes the Defendant actually terminated her "because I was telling them I was hurt and I was having to keep going to the doctor."  (Dep. Washington 82:8-14.)  In other words, the Plaintiff alleges that her time card problem was not the true reason that Defendant terminated her.

## III.    SUMMARY JUDGMENT STANDARD

The moving party bears the burden of showing that summary judgment is proper.  Summary judgment is proper if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Rule 56(c), FRCP; Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  Summary judgment is proper if the non-moving party fails to establish an essential element of any cause of action upon which the non-moving party has the burden of proof.  Celotex, 477 U.S. at 323.  Once the moving party has brought into question whether there is a genuine issue for trial on a material element of the non-moving party's claims, the non-moving party bears the burden of coming forward with specific facts which show a genuine issue for trial.  Fed.R.Civ.P. 56(e); Matsushita Electrical Industrial Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574 (1986).  The non-moving party

_____

August 2004, she took approximately eight days of FMLA leave due to a "febrile illness." (Document # 23, Exhibits 1-2.)  It appears that some of this leave may have been paid and some unpaid.

must come forward with enough evidence, beyond a mere scintilla, upon which the fact finder could reasonably find for it. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). The facts and inferences to be drawn therefrom must be viewed in the light most favorable to the non-moving party. Shealy v. Winston, 929 F.2d 1009, 1011 (4th Cir. 1991). However, the non-moving party may not rely on beliefs, conjecture, speculation, or conclusory allegations to defeat a motion for summary judgment. Barber v. Hosp. Corp. of Am., 977 F.2d 874-75 (4th Cir. 1992). The evidence relied on must meet "the substantive evidentiary standard of proof that would apply at a trial on the merits." Mitchell v. Data General Corp., 12 F.3d 1310, 1316 (4th Cir. 1993).

Rule 56(e) provides, "when a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." See also Celotex, 477 U.S. at 324 (Rule 56(e) permits a proper summary judgment motion to be opposed by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves"). To raise a genuine issue of material fact, a party may not rest upon the mere allegations or denials of his pleadings. Rather, the party must present evidence supporting his or her position through "depositions, answers to interrogatories, and admissions on file, together with ... affidavits, if any." Celotex, 477 U.S. at 322. See also Cray Commc'n, Inc. v. Novatel Computer Systems, Inc., 33 F.3d 390 (4th Cir. 1994); Orsi v. Kickwood, 999 F.2d 86 (4th Cir. 1993); Local Rules 7.04, 7.05, D.S.C.

## IV.    DISCUSSION

### A. FMLA Statute of Limitations

The Defendant moves for summary judgment on the Plaintiff's first cause of action for violation of the Family Medical Leave Act ("FMLA") due to the expiration of the statute of limitations. Generally FMLA claims are subject to a two-year statute of limitations. 29 U.S.C. § 2617(c)(1) (2000). However, the limitations period is extended to three years if the alleged FMLA violation is deemed "willful." 29 U.S.C. § 2617(c)(2) (2000). Whether the Defendant's alleged FMLA violation is deemed "willful" is crucial in this case because the Plaintiff filed her complaint after the two-year limitations period had run but before the three-year limitations period expired. Plaintiff's eye injury occurred at work on October 27, 2004, and Defendant terminated Plaintiff's employment on November 29, 2004. Plaintiff filed her Complaint on September 27, 2007, which is approximately two years and ten months after the date the Defendant terminated her employment.

In her Response brief, the Plaintiff explained her argument that the Defendant acted willfully:

> [W]hen the Plaintiff returned from seeing Dr. Gaddy the Plaintiff was to be out of work for two day. The Plaintiff specifically remembers the nurse calling the doctor's office and requesting that the note be changed to light duty. As a result of that phone call the Plaintiff was required to come to work and sit in the nurse's station. The willful actions of the nurse instead of permitting the Plaintiff to be at home to recover were reckless and inconsiderate of the Plaintiff's serious health condition. The Defendant showed disregard for the Plaintiff's health. Therefore in requesting that the note be changed the Defendant failed to accommodate the employee's condition and the employee's request. The Defendant contends that the defendant set all the Plaintiff's appointments. However the Plaintiff testified contrary to this statement.

(Document # 21 at pp. 8-9.)

Although the FMLA does not define "willful" and it appears that the Supreme Court and the Fourth Circuit Court of Appeals have not interpreted the meaning of "willful" within the FMLA context, other circuit courts have interpreted "willful" to mean where the employer "knew or showed reckless disregard for the matter of whether its conduct was prohibited by the [Act]." See Bass w. Potter, 522 F.3d 1098, 1104 (10th Cir. 2008); Hillstrom v. Best W. TLC Hotel, 354 F.3d 27, 33 (1st

10

Cir. 2003); Porter v. New York Univ. Sch. of Law, 392 F.3d 530, 531 (2nd Cir. 2004); Hoffman v.

Prof'l Med Team, 394 F.3d 414, 417-18 (6th Cir. 2005); Hanger v. Lake County, 390 F.3d 579, 583

(8th Cir. 2004). See also McLaughlin v. Richland Shoe Co., 486 U.S. 128, 133-35 (1988).[7] "[I]f any

employer acts reasonably in determining its legal obligation, its actions cannot be deemed willful

. . . . If an employer acts unreasonably, but not recklessly, in determining its legal obligation, then

. . . it should not be considered [willful]." Porter, 392 F.3d at 531-32 (citing McLaughlin);

Hillstrom, 354 F.3d at 33 (same).

The FMLA provides for up to twelve weeks of unpaid leave to deal with a serious health

condition or family related matters. Yashenko v. Harrah's NC Casino Co., 446 F.3d 541, 546 (4th

Cir. 2006); 29 U.S.C. § 2612(a)(1). The FMLA makes it "unlawful for any employer to interfere

with, restrain, or deny the exercise of or attempt to exercise, any right provided. 29 U.S.C.

§2615(a)(1). Also, the FMLA protects an employee in the event he is discriminated or retaliated

against in response to exercising his rights under the FMLA by creating a private right of action

against the employer. Yashenko v. Harrah's NC Casino Co., 446 F.3d 541, 546 (4th Cir. 2006); 29

U.S.C. § 2615(a)(2); 29 C.F.R. § 825.220.

If a Plaintiff claims that his rights under the FMLA were violated, the Plaintiff has the burden

to prove that he was entitled to a benefit under the FMLA but he was denied that benefit. Rigel v.

Wilks, C/A No. 1:03-971, available at 2006 WL 3831384 at *13 (M.D. Pa. 2006). "Under the

FMLA, the employer's duties are triggered when the employee provides enough information to put

---

[7]    In an unpublished opinion, the Fourth Circuit Court of Appeals appeared to agree that to prove "willful" a plaintiff must show that defendant knew or showed reckless disregard for the matter of whether its conduct was prohibited by the FMLA. See Honeycutt v. Baltimore Co., Md., No. JFM-06-0958 (D.Md. 2007) available at 2007 WL 1858691, aff'd, 2008 WL 2116404 (4th Cir. May 20, 2008).

the employer on notice that the employee may be in need of FMLA leave.  The employee need not specifically mention FMLA leave but must state that leave is needed.  See 29 C.F.R. § 825.303." Browning v. Liberty Mut. Ins. Co., 178 F.3d 1043, 1049 (8th Cir. 1999).  See also Russell v. First Health Servs., No. 01-1149, *available at* 2001 WL 568037 (4th Cir. 2001) (explaining that an employee has a threshold obligation under the FMLA to give the employer enough information to determine whether her absence related to a reason covered by the FMLA); Price v. City of Fort Wayne, 117 F.3d 1022, 1026 (7th Cir. 1997) (explaining that whether an employee is aware of the FMLA is not relevant; the employee needs to give notice to the employer that leave is needed for a covered reason).

To raise a genuine issue of material fact, the Plaintiff must present some evidence of "willfulness" through depositions, affidavits, answers to interrogatories, or admissions on file.  The Plaintiff argues that the Defendant's changing her doctor's note from "out of work" to light duty meets the "willful" standard.  The pertinent evidence in the record is that on Monday, November 1, 2004, Plaintiff saw an optometrist, Dr. Gaddy, in Dillon, and that he prescribed her more eye drops. On November 2, 2004, Plaintiff returned to Dr. Gaddy's office who scheduled her for an appointment with an ophthalmologist in Florence, Dr. Goulas, at 1:00 p.m. that same day.  Dr. Goulas dilated Plaintiff's eyes and prescribed her some additional eye drops.  Dr. Goulas wrote a note for the Plaintiff to be excused from work on November 2, 2004,[8] and that she not have to return until Monday, November 8, 2004.  On November 2, 2004, the Plaintiff returned to work with Dr. Goulas' work excuse note.  While the Plaintiff stood beside Mary Sutherland, nurse Sutherland

---

[8] In her brief Plaintiff incorrectly asserts that Dr. Gaddy wrote the note excusing her from work.  It was the subsequent visit with Dr. Goulas that produced the work excuse note.  See Dep. Washington 34-35.

telephoned Dr. Goulas' office to ask if the note could be changed so that the Plaintiff could work provided the nurse just had her sit and provided Plaintiff would not be exposed to chemicals.  This phone call by Sutherland to Dr. Goulas' office to request that the work excuse be changed appears to be the crux of the Plaintiff's assertion of willfulness – that Defendant through Sutherland recklessly disregarded the Plaintiff's serious health condition by contacting the medical provider to request that the work excuse by changed and requiring her to come in to work and sit at the nurse's station instead of recovering at home.

Sutherland testified that she worked as the Wellness Center Manager at the Defendant's plant in Dillon, South Carolina from mid-September 1999 until November 2006.  She stated that she remembered Linda Washington but that she does not specifically recall any events involving her November 2, 2004, work excuse note from Dr. Goulas.  Sutherland recalled that when she was presented with a medical excuse her practice was to ask the employees if they wanted to perform accommodating work if such work was available because plant workers could rarely afford seven consecutive days of unpaid leave and often wanted and needed accommodating work while they overcame their health condition.[9]  If the employee wanted to perform accommodating work but the work excuse did not specify work restrictions, Sutherland's practice was to obtain the employee's permission to telephone the health care provider to ask whether the employee could perform restricted work and if so the nature of the restrictions.  Sutherland recalled that she would call the provider "while the employee is standing near me in the same room and can hear me ask the health

---

[9] The FMLA regulations provide that, under some circumstances, an employer may obtain information related to whether an employee is unable to perform work of any kind and it may, with the employee's permission, seek clarification of a medical certification.  See, e.g., 29 C.F.R. §§ 825.306(b)(4)(i), 825.307(a).

care provider for the information the employee has given me permission to ask for." Sutherland explained that if she could find accommodating work within the plant she offered that work to the employee and that she has never forced or coerced an employee to take light duty or accommodating work.

A reasonable inference from this evidence is that the Defendant was trying to provide work to the Plaintiff so that she would not incur unpaid leave. In other words, while the Plaintiff was recovering from her eye injury, she could essentially sit and do nothing and get paid as opposed to sitting at home on unpaid leave. Plaintiff did not refute Sutherland's statement that she has never forced or coerced an employee to take light duty or accommodating work. Plaintiff did not testify that between November 2, 2004, and November 8, 2004, she objected to coming to work[10] or that she objected to Sutherland calling Plaintiff's doctor to ask whether she could perform accommodating work. The parties do not fully address whether Nurse Sutherland's actions are a technical violation of the FMLA. See 29 C.F.R. §825.307(a). While there is nothing in the record disputing that Dr. Goulas changed his work excuse and allowed Plaintiff to work with restrictions, Nurse Sutherlands contact with Dr. Goulas' office may be a technical violation of the FMLA. Cf. Samuels v. Kansas City Missouri School Dist., 437 F.3d 797, 804 (8th Cir. 2006)(attempt to accommodate are not indicative of willful conduct); Porter, 392 F.3d at 531-32 (negligence is not willful conduct). Nurse Sutherland's testimony clearly sets forth a valid reason for her actions should a jury choose to accept her testimony. Such a determination is a question of fact for a jury.

---

[10] Plaintiff did state that on October 28, 2004, she requested to go home but Plaintiff implied that Mary [Sutherland] would not let her. (Dep. Washington 27:2 - 28:2.) However, this alleged incident happened prior to the doctor's November 2, 2004, work excuse note and it does not appear that the October 28, 2004, two day excuse qualifies as a serious health condition. See 29 C.F.R.§825.114.

Therefore, Defendant's motion for summary judgment as to "willfulness" should be denied regarding Nurse Sutherland's contact with Dr. Goulas. Also, Plaintiff's claim for retaliation – termination – for exercising her rights under the FMLA by its nature can only be willful conduct. Thus, Defendant's motion for summary judgment against these claims based on the statute of limitations should be denied.

However, to the extent Plaintiff claims a willful violation of the FMLA based on Defendant denying her the right to attend appointments with medical care providers, summary judgment should be granted. In her brief Plaintiff asserts a purported dispute in the record as to whether the Defendant set all of the Plaintiff's doctor's appointments or the Plaintiff made some of her own doctor's appointments and that such evidence supports a finding of "wilfullness." Even if the Plaintiff did make some of her own doctor's appointments, the fact that the Defendant made several appointments for the Plaintiff to visit several doctors during the work day regarding her eye injury demonstrates that the Defendant permitted the Plaintiff to obtain treatment. In fact, the Plaintiff testified that every time she requested medical or personal leave the Defendant granted it to her. The Plaintiff has presented no evidence that the Defendant knew or showed reckless disregard for the matter of whether its conduct was prohibited by the FMLA relating to any claim that Defendant denied her the right to make or attend medical appointments. Thus, summary judgment for the Defendant is appropriate for this claim both because it is time barred by the two-year limitations period and, alternatively, on the merits of the claim.

**B. Violation of the FMLA**

The Plaintiff argues that the "Defendant failed to allow the Plaintiff to take medical leave even when presented with a medical excuse." (Document # 21 at p.9) This appears to raise a

substantive, or prescriptive, right that the Plaintiff sought to take FMLA leave but allegedly the Defendant denied her request.  See Yashenko, 446 F.3d at 546 (explaining the difference between a FMLA claim that a prescriptive right was violated as opposed to a proscriptive right).  It is undisputed that based upon the Plaintiff's October 27, 2004, eye injury, she did not specifically request to take FMLA leave.[11]  However, she could still have a claim because, as noted above, the employer's FMLA duties are triggered when the employee provides enough information to put the employer on notice that the employee may be in need of FMLA leave for a reason covered by the FMLA; the employee need not specifically mention the FMLA by name.

Apparently, the Plaintiff alleges that when she presented a work excuse note from Dr. Goulas that the Plaintiff should stay at home from November 2, 2004, until November 8, 2004, the Defendant did not honor that request.  This claim relates to Sutherland's telephone call to Dr. Goulas' office.  The record shows that the Plaintiff stood near Sutherland during that call and did not voice any objection to her making the call.  The regulations require that if clarification is needed such contact by Nurse Sutherland with Dr. Goulas must be with the consent of the employee.  29 C.F.R. §825.307(a).  It is not necessary to determine whether Plaintiff's conduct amounts to a consent because, assuming lack of consent, Nurse Sutherland's conduct was a mere technical violation.  See Darst v. Interstate Brands Corp., 512 F.3d 903, 910 (7th Cir. 2008); Bass, 522 F.3d at 1106, n. 8.  Furthermore, it is undisputed that Dr. Goulas changed the work restriction to allow restricted duties and no exposure to chemicals.  Therefore, Plaintiff fails to show prejudice as a result

_____

[11] The fact that the Plaintiff had signed paperwork to take FMLA leave several times prior to her eye injury tends to demonstrate that the Plaintiff did know how to request leave due to pain and/or recovery from an injury.

of this potential technical violation. It is Plaintiff's burden to show a genuine issue of material fact and she has failed to do so.

The evidence further shows that on November 9, 2004, Plaintiff returned to Dr. Goulas' office, that Dr. Goulas recommended that Plaintiff remain out of work for November 9, 2004, and November 10, 2004, and that the Plaintiff did not work on either of those days. After Dr. Goulas' recommendation on November 9, 2004, there is no evidence in the record that he or any other health care provider gave the Plaintiff a medical excuse to be out of work. It appears that the Plaintiff worked full shifts on the following days: November 11 and 12, 2004, November 15, 16, and 17, 2004. On Thursday, November 18, 2004, Plaintiff visited Dr. Goulas in Florence. Dr. Goulas documented that Plaintiff's "eyes appear much better," and that he believed Plaintiff's eyes were "back to baseline." Dr. Goulas recommended that she return to work on Monday, November 22, 2004, and she did. There is no evidence that the Defendant refused to permit the Plaintiff to visit the doctor on November 9 or 18, 2004, or at any other time. At the summary judgment stage where the Plaintiff has the burden to present some evidence that she was entitled to a benefit under the FMLA but she was denied that benefit, the Plaintiff has not done so. Accordingly, to the extent the Plaintiff claims a substantive, or prescriptive, violation of the FMLA the court should grant the Defendant's Motion for Summary Judgment.

### C. Retaliation in Violation of the FMLA

The Plaintiff appears to claim that she was terminated for exercising her rights under the FMLA. In her own words, she stated that she believes the Defendant terminated her "because I was telling them I was hurt and I was having to keep going to the doctor." (Dep. Washington 82:8-14.) The FMLA provides protection to an employee in the event he is discriminated or retaliated against

in response to exercising his rights under the FMLA (i.e., taking or requesting leave) by creating a private right of action against the employer.  Yashenko v. Harrah's NC Casino Co., 446 F.3d 541, 546 (4th Cir. 2006); 29 U.S.C. § 2615(a)(2).  "FMLA [retaliation] claims are analogous to those derived under Title VII and so are analyzed under the burden-shifting framework of McDonnell Douglas." Yashenko v. Harrah's NC Casino Co., 446 F.3d 541, 550-551 (4th Cir.2006).  See also Whatley v. South Carolina Dep't of Public Safety, C/A No. 3:05-42-JFA-JRM, *available at* 2007 WL 120848 (D.S.C. 2007). Therefore, to establish a prima facie claim for FMLA retaliation, "a plaintiff must prove: (1) he engaged in protected activity; (2) the employer took adverse action against him; and (3) the adverse action was connected to the plaintiff's protected activity." Whatley, 2007 WL 120848 at *8 (citing Yashenko, 446 F.3d 541).  "If the plaintiff meets his burden, then defendant must demonstrate that any adverse action it took against plaintiff was non-discriminatory. Once the employer proves a non-discriminatory purpose for its adverse employment action, then plaintiff must prove that the employer-alleged reasoning is pretext for FMLA retaliation."  Id.

The Plaintiff has presented evidence that she engaged in protected activity – taking days off and going to the doctor in relation to her eye injury.  It is undisputed that the Defendant terminated Plaintiff's employment on November 29, 2004.  For purposes of this motion, the temporal proximity of Plaintiff's protected activity and her termination, within thirty (30) days, could demonstrate that Plaintiff's termination was connected to her protected activity.  See Washington v. International Paper Co., C/A No. 2:05-1949-DCN, *available at* 2006 WL 5619289 at *8 (D.S.C. 2006) (noting that temporal proximity is sufficient to establish a prima facie causal connection between protected activity and termination but is not sufficient to establish a genuine issue as to retaliatory pretext). Thus, Plaintiff presents a prima facie case.

18

The burden then shifts to Defendant to demonstrate that Plaintiff's termination was non-discriminatory. The evidence is that the Plaintiff was clocked in during certain time frames on November 2, 9, and 18, 2004, when she was not at work. The evidence further shows that it was the Plaintiff's responsibility to protect her kronos card so that it was used appropriately. Defendant's policy concerning time cards stated, "[t]ampering with time cards or time clocks, punching in or out for another associate, allowing someone else to punch in or out for you, or in any way falsifying time records are grounds for termination." The Plaintiff could not explain why she had been clocked in when she was not at work while her time card was kept locked in her locker. Around November 21, 2004, Defendant investigated Plaintiff's time card discrepancies. On November 22, 2004, Patterson, Plaintiff's supervisor, met with Plaintiff to discuss the time card investigation. On November 23, Plaintiff was given notice of a three-day suspension with termination to follow; the Defendant's stated reason was for violation of Defendant's time card policy. Thus, Defendant presents its non-discriminatory reason.

The burden shifts back to the Plaintiff to present some evidence that the employer-alleged reason for termination is pretext for FMLA retaliation. The court finds no evidence that permits a reasonable inference of pretext. Plaintiff testified that she had never had problems with her time card until after her eye injury. She further testified that she has no knowledge as to how, or by whom, she was clocked-in and clocked-out when she was not present. To draw any inference to create an issue of material fact as to pretext would amount to pure speculation based on the record presented.

An employee who takes FMLA leave may still be terminated by the employer for a legitimate reason. In other words, the fact that the employee took FMLA leave does not protect the employee from being terminated who was otherwise going to be terminated. See Yashenko, 446 F.3d at 547

(holding that the FMLA provides an employee only a limited right to restoration to his previous employment position and that the FMLA does not require an employee to be restored to his prior job after FMLA leave if he would have been discharged had he not taken leave); <u>Throneberry v. McGehee Desha County Hosp.</u>, 403 F.3d 972, 977 (8th Cir. 2005) (finding that the FMLA does not force an employer to retain an employee when the employer would not have retained the employee had the employee not been on FMLA leave). Defendant presents its legitimate reason for the termination of Plaintiff's employment and Plaintiff fails to present evidence of pretext from which a reasonable juror could find her termination was in violation of the FMLA.

**D. Wrongful Termination in Violation of Public Policy**

The Plaintiff's second cause of action is pursuant to South Carolina law for wrongful termination in violation of public policy, namely the right of an injured person to seek medical treatment for an injury. (Am. Comp. ¶ 43.) In her Response brief, the Plaintiff argues that her wrongful termination claim is "for requesting to see the doctor not for requesting medical leave."[12] (Document # 21 at p.10.) In South Carolina, there is a public policy exception to the at-will employment doctrine. That is, "where the retaliatory discharge of an at-will employee constitutes violation of a clear mandate of public policy, a cause of action in tort for wrongful discharge arises." <u>Ludwick v. This Minute of Carolina, Inc.</u>, 337 S.E.2d 213, 216 (S.C. 1985). Several types of public policies have been deemed appropriate to sustain this cause of action including: requiring an

---

[12] The Defendant argues that under the facts of this case "there is not a nickel's worth of difference between" a public policy prohibition against termination for requesting to see a doctor versus a FMLA statutory prohibition against termination for requesting to take FMLA leave to go see a doctor. (Document # 23 at p.4.) The court agrees. As explained in sections A and B herein, the FMLA substantive rights may be violated where an employee without mentioning the FMLA seeks leave for a covered reason, such as the employee's own serious health condition.

employee to violate the criminal law, where the reason for the employee's termination was itself a violation of criminal law, obeying a subpoena, refusing to contribute money to a political action fund, and invoking rights under Payment of Wages Act. See Id.; Evans v. Taylor Made Sandwich Co., 522 S.E.2d 350, 354 (S.C. App. 1999). The Plaintiff did not cite any case law to support her theory that "requesting to see the doctor" is a public policy of South Carolina. Even if that is a public policy, if the employee has a statutory remedy for the wrongful termination itself, South Carolina would refuse to extend the public policy exception to cover that claim. See Evans v. Taylor Made Sandwich Co., 522 S.E.2d 350 (S.C. App. 1999) (citing Stiles v. American Gen. Life Ins. Co., 516 S.E.2d 449, 452 (1999) (Toal's concurring opinion)).

As discussed above, the FMLA provides for a cause of action for wrongful termination against the employer in the event an employee is discriminated or retaliated against (or terminated) in response to exercising his rights under the FMLA. Yashenko v. Harrah's NC Casino Co., 446 F.3d 541, 546 (4th Cir. 2006); 29 U.S.C. § 2615(a)(2). In this case, where the Plaintiff states a cognizable claim under the FMLA for being terminated because she requested to go see the doctor about her eye injury, this court believes that South Carolina courts would not permit a claim for wrongful termination in violation of public policy because "the Ludwick exception is not designed to overlap an employee's statutory ... rights to challenge a discharge, but rather to provide a remedy for a clear violation of public policy where no other reasonable means of redress exists." Stiles v. American Gen. Life Ins. Co., 516 S.E.2d 449, 452 (1999) (Toal's concurring opinion). See also Wessinger v. Westinghouse Elec. Co., C/A No. 3:06-1346, available at 2007 WL 1128887 at *2 (D.S.C. 2007) (noting that the public policy exception to at-will employment does not "extend to every discharge arguably contrary to general concepts of public policy"). Under the facts of this

case, the Plaintiff's second cause of action would not be recognized by a South Carolina court because there is other reasonable means of redress – the claim for retaliation in violation of the FMLA. Cf. Dockins v. Ingles Markets, Inc., 413 S.E.2d 18, 19 (S.C. 1992) (holding that where a federal or state statute creates a substantive right and provides a remedy for infringement of that right the plaintiff is limited to that statutory remedy; the terminated employee could proceed under the Fair Labor Standards Act and the state action for wrongful discharge in violation of public policy would not lie). Furthermore, even if such a claim were recognized, Plaintiff fails to present facts showing a violation of such purported public policy because Defendant did not prevent Plaintiff from seeing a medical provider.

V.      CONCLUSION

In light of the above analysis, it is recommended that Defendant's Motion for Summary Judgment (Document # 16) be granted.

 s/Thomas E. Rogers, III
Thomas E. Rogers, III
United States Magistrate Judge

December 10, 2008
Florence, South Carolina

**The parties' attention is directed to the important notice contained on the following page.**

22

### Notice of Right to File Objections to Report and Recommendation

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Court Judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. In the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must "only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation." *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005).

Specific written objections must be filed within ten (10) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). The time calculation of this ten-day period excludes weekends and holidays and provides for an additional three (3) days for filing by mail. Fed. R. Civ. P. 6(a) & (e). Filing by mail pursuant to Fed. R. Civ. P. 5 may be accomplished by mailing objections to:

Larry W. Propes, Clerk
United States District Court
P. O. Box 2317
Florence, South Carolina 29503

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985).